# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

————————————

No. ACM 40642

————————————

**UNITED STATES**
*Appellee*

v.

**Kenneth M. GRIFFIN**
Master Sergeant (E-7), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 26 January 2026

————————————

*Military Judge*: Lance R. Smith.

*Sentence*: Sentence adjudged 29 February 2024 by GCM convened at Vandenberg Space Force Base, California. Sentence entered by military judge on 28 March 2024: confinement for 30 months, reduction to E-1, and a reprimand.

*For Appellant*: Captain Joyclin N. Webster, USAF.

*For Appellee*: Lieutenant Colonel Jenny A. Liabenow, USAF; Major Vanessa Bairos, USAF; Major Adam M. Love, USAF; Major Jocelyn Q. Wright, USAF; Captain Heather B. Bezold, USAF; Mary Ellen Payne, Esquire.

Before DOUGLAS, MASON, and KUBLER, *Appellate Military Judges*.

Judge KUBLER delivered the opinion of the court, in which Senior Judge DOUGLAS and Judge MASON joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

KUBLER, Judge:

A military judge at a general court-martial found Appellant, contrary to his pleas, guilty of two specifications of sexual abuse of a child, LA, by touching her vulva with his hand to satisfy his sexual desires, in violation of Article 120b, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920b.[1,2,3] The military judge sentenced Appellant to confinement for 30 months for each specification to run concurrently, reduction to the grade of E-1, and a reprimand. Appellant requested the convening authority defer his reduction in rank until the entry of judgment and waive all automatic forfeitures for the benefit of his dependent children. The convening authority took no action on the findings or the sentence, deferred Appellant's reduction in rank until entry of judgment, and waived automatic forfeitures for a period of six months, to be paid to the legal guardian of his dependent children for their benefit.

Appellant raises five issues on appeal, which we have reworded and reordered: (1) whether the military judge abused his discretion by admitting prior consistent statements; (2) whether the findings of guilty are factually sufficient; (3) whether Appellant was denied effective assistance of counsel; (4) whether the sentence was inappropriately severe; and (5) whether, as applied, 18 U.S.C. § 922, is unconstitutional. We also considered one additional issue not raised by Appellant, but identified during this court's Article 66(d), UCMJ, 10 U.S.C. § 866(d), review: (6) whether Appellant is entitled to relief for facially unreasonable appellate delay.

We have carefully considered issue (4) and find it warrants neither discussion nor relief. *See United States v. Guinn*, 81 M.J. 195, 204 (C.A.A.F. 2021) (citing *United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987)).

---

[1] Unless otherwise noted, all references to the UCMJ, to the Rules for Courts-Martial, and Military Rules of Evidence (Mil. R. Evid.) are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] In Specification 2 of the Charge, the military judge excepted the words "on divers occasions," found Appellant not guilty of the excepted words, but guilty of the remainder of the specification. The military judge stated on the record which event he found Appellant guilty of:

> I convicted the accused of the event where [LA] testified the accused carried her into her room, which was in her mother's Tucson Arizona residence, tossed her on [her sister]'s bed put his hand down her pants and touched her vagina over her underwear. This event happened during the charged time frame just shortly before the accused deployed in June of 2019.

[3] Appellant was acquitted of two other Article 120b, UCMJ, specifications against LA.

We have also carefully considered issue (5) and find it warrants neither discussion nor relief. *Id.*; *see also United States v. Johnson*, __ M.J. __, No. 24-0004, 2025 CAAF LEXIS 499, at *13–14 (C.A.A.F. 24 Jun. 2025) (holding Courts of Criminal Appeals lack "authority to modify the [18 U.S.C.] § 922 indication" in the entry of judgment).

As to the remaining issues, we find no error that materially prejudiced Appellant's substantial rights, and we affirm the findings and sentence.

## I. BACKGROUND

Appellant's daughter, KG, attended an after-school program at Davis Monthan Air Force Base (AFB), Arizona, where she became friends with LA. Appellant met LA's mother, JA, when they were picking up their respective children from the after-school program. Over time, Appellant and JA formed a romantic relationship with each other. Appellant's relationship with JA and LA's friendship with KG brought the families together and LA eventually viewed Appellant as a father figure and referred to him as her stepdad. Appellant would play and roughhouse with his daughter, LA, and LA's sister SA.

Appellant's relationship with LA's mother, JA, fluctuated over the years they knew each other, from when they met in 2016 through 2020. During those four years Appellant deployed twice, once in 2018 and once in 2019.

Appellant, who was set to deploy for a second time in June 2019, went to the home of JA more frequently in the month leading up to his departure, occasionally staying over with JA and her three children—LA, SA, and DA. "Before he left for [the deployed location,]—JA explained— [Appellant] was there pretty frequently for the last month he was there." During Appellant's visits to LA's home he roughhoused with LA as had been typical in their relationship. Then, LA, in 6th grade going on to 7th grade, was between 11 and 12 years old.

During his 2019 yearlong deployment, Appellant spoke with JA every day over social media. On 30 August 2019, during an incident unrelated to Appellant, LA told a Tucson police officer that she had a good relationship with her stepdad (referring to Appellant), and they had a goofy relationship and were close. During Appellant's 2019 deployment, LA sent Appellant a message wishing him a happy Father's Day, telling him that he was the only father figure she had in her life.

On 25 June 2020, after Appellant had returned from his deployment, JA drove from Tucson with her three children to visit him and his daughter KG at Vandenberg AFB, California, in the temporary lodging facility (TLF). While in the TLF, JA's daughters, LA and SA, shared a room, and Appellant's daughter KG chose to stay with them in their room so they could spend time together. JA's son DA stayed in the living room and JA stayed with Appellant in his

room. On 27 June 2020, Appellant, JA, and the children went to a shopping outlet together and returned to the TLF. On 28 June 2020, JA and her children drove back to Tucson with a plan to see Appellant during Christmas.

Appellant's relationship with JA ended at the end of 2020. LA saw how it impacted her mother when Appellant "ghosted" JA during the months of October, November, and December 2020. In November 2020, LA removed Appellant from her social media account. On 22 January 2021, JA learned that Appellant was seeing another woman and confronted him by text messages. JA continued to send text messages to Appellant through January and February and received one response, "TY" (thank you), after JA let Appellant know she sent the closing documents from when she had previously helped with the sale of his home in Arizona. JA's last text message to Appellant was on 25 February 2021. LA knew that Appellant began seeing another woman.

On 1 March 2021, JA overheard LA talking with her friend SH. JA overheard SH say something to the effect of, "[Y]ou wanted to talk to him about what he did," or "Are you not going to tell her what he did to you?" When JA overheard this exchange she asked, "[W]hat who did?" and LA told her, "I don't want to have this conversation right now." JA became concerned and brought LA and SH into her bedroom to ask what was going on. LA, reluctant at first, eventually stated someone had hurt her. JA asked LA who hurt her but LA would not answer. LA said it is a person who is no longer here. JA just started naming people and LA said no and no. Eventually JA said, "Grif?" referring to Appellant and LA looked at her mother and nodded downwards. JA did not have any details about what specifically occurred and sought help, which led to interviews by law enforcement agents in Arizona and the Air Force Office of Special Investigations (AFOSI).

As a result of investigation, the Air Force charged Appellant with four specifications of sexual abuse of a child, of which Appellant stands convicted of two. The first offense occurred in Tucson, Arizona, at JA and LA's home in 2019, during the month Appellant frequented their home prior to his 2019 deployment. The second offense occurred in 2020 when JA and the family visited Appellant in the TLF at Vandenberg AFB, after Appellant returned from his 2019 deployment. Both offenses involved Appellant committing a lewd act upon LA in violation of Article 120b, Uniform Code of Military Justice (UCMJ). Additional details regarding LA's testimony and the trial defense counsel's cross-examination of her are described below.

## II. DISCUSSION

### A. Prior Consistent Statements

#### 1. Additional Background

Trial defense counsel's cross-examination of JA and LA established that LA referred to Appellant as stepdad and a father figure up until at least the summer of 2019. Trial defense counsel also established that LA was aware Appellant stopped communicating with her mother in the October, November, December 2020 time frame. In November 2020, LA removed Appellant from her social media account. LA later learned Appellant began a relationship with another woman, betraying her mother and her family. This betrayal angered LA and the defense theory was this served as a motive to fabricate for LA.

Over the Defense's objection, trial counsel subsequently elicited testimony from two witnesses—AH and HC—regarding pretrial statements LA made about the alleged offenses. We summarize each in turn.

##### a. AH

LA told a friend, AH, that LA's mother's boyfriend inappropriately touched LA. The trial counsel had the following exchange with AH:

Q: What did [LA] tell you when she reported that she had been inappropriately touched?

A. She wouldn't tell me exactly how she was touched, but she told me that someone did touch her. And she said that it was – as I recall, her mom's boyfriend. And I told her to go tell her mom or to tell somebody else because I couldn't help her the way that I know that she needed to be. So, it was a quick phone call. She told me and then we texted about it, but I don't recall anything she said or anything that happened after.

AH and LA both testified to this conversation occurring, though at different times. LA testified the conversation occurred in February 2021 shortly before she told her mother JA about what Appellant did. However, AH testified the conversation occurred earlier. Based on AH's recollection of the school year, COVID, and the changes in her friendship with LA, AH stated it occurred at the end of the school year in 2020 and before August 2020. Trial defense counsel objected saying this was not a prior consistent statement because LA stated it occurred in February 2021, which would have been after the motive to fabricate. The military judge questioned the witness, AH, as to the timing of when the conversation took place and then made the following findings on the record.

Based on all the testimony that I've heard, I am convinced the – by a preponderance of the evidence that this conversation

happened around August of 2020. This statement that she made to – that [LA] made to this witness, [AH], happened in August of 2020, and it is consistent with her testimony that her mom's boyfriend sexually abused her. And that statement was made prior to the incidents that the [D]efense crossed both [LA] and her mom on in terms of basically this motive to fabricate based on the fact that the accused was ghosting her. And so, I will consider the – I will consider the answer and the testimony.

### b. HC

The Government later called HC, a friend of LA who met her in 2021. Over defense objection, the Government elicited that LA told HC Appellant sexually abused her as a prior consistent statement from HC. The Defense objected that even according to LA's testimony she told HC after she told her mother JA, and that the motive to fabricate was earlier. Trial counsel argued that the trial defense counsel's cross-examination of LA and her mother JA regarding how the animus each of them developed toward Appellant put forth a theory that JA and LA conspired with each other to form the allegations. They established with HC that LA was concerned about telling her mother about the abuse which logically placed the discussion before JA told her mother. This prior consistent statement then preceded the defense theory of a conspiracy between JA and LA to fabricate the allegations.

> [Military Judge]: . . . I do believe that the defense counsel challenged both [LA] and her mother basically on this idea that – basically establishing the theory of motive to fabricate on their part between the fall of 2020 and the time of the report on the 1st of March 2021. So, as I did with the other witness, I find that the fact that this witness, [HC], will testify that [LA] told her – told him that the [Appellant] had abused her before she told her mom, and before her mom reported these things to [the] Tucson Police Department. I find that that is a prior consistent statement. In other words, she's telling [HC] [Appellant] sexually abused me, and that's exactly what her testimony was in trial yesterday. So, I find that those statements are consistent. I find that the statement made to [HC] was a prior consistent statement, and it's proper for the [G]overnment to offer this to rebut the [D]efense's theory of recent fabrication.

### c. Trial Judge's Mil. R. Evid. 403 Analysis

The military judge analyzed whether admitting the prior consistent statements for HC and AH were overly prejudicial under Mil. R. Evid. 403. The judge found the evidence relevant and that it rebutted the defense theory of

recent fabrication. He did not find the evidence unfairly prejudicial and noted that in this judge-alone trial he was confident that he could place the evidence in the proper context. He found the probative value of the evidence was not substantially outweighed by any of the other factors under Mil. R. Evid. 403.

**2. Law**

We review a military judge's decision to admit evidence for an abuse of discretion. *United States v. Finch*, 79 M.J. 389, 394 (C.A.A.F. 2020) (citing *United States v. Frost*, 79 M.J. 104, 109 (C.A.A.F. 2019)). "A military judge abuses his discretion when his findings of fact are clearly erroneous, the court's decision is influenced by an erroneous view of the law, or the military judge's decision on the issue at hand is outside the range of choices reasonably arising from the applicable facts and the law." *United States v. Kelly*, 72 M.J. 237, 242 (C.A.A.F. 2013) (citation omitted). "[T]he abuse of discretion standard is strict, 'calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous.'" *United States v. Erikson*, 76 M.J. 231, 234 (C.A.A.F. 2017) (quoting *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000)).

Hearsay is generally inadmissible unless an exception applies. Mil. R. Evid. 802. However, Mil. R. Evid. 801(d)(1)(B) provides that a statement is not hearsay if it "is consistent with the declarant's testimony and is offered: (i) to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; or (ii) to rehabilitate the declarant's credibility as a witness when attacked on another ground . . . ."

The United States Court of Appeals for the Armed Forces (CAAF) has identified three criteria for out-of-court statements to be admissible as a non-hearsay prior consistent statement: "(1) the declarant of the statement must testify and must be subject to cross-examination about the prior statement; (2) the statement must be consistent with the declarant's testimony; and (3) the statement must be offered 'to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in testifying.'" *Frost*, 79 M.J. at 109–10 (C.A.A.F. 2019) (citation omitted). In addition, "the prior statement . . . must precede any motive to fabricate or improper influence that it is offered to rebut," and "where multiple motives to fabricate or multiple improper influences are asserted, the statement need not precede all such motives or inferences, but only the one it is offered to rebut." *Id.* at 110 (citations omitted). The prior consistent statement need not be identical to the witness's testimony in order to be admissible under Mil. R. Evid. 801(d)(1)(B), provided it is "for the most part consistent" and "consistent with respect to . . . fact[s] of central importance to the trial." *Finch*, 79 M.J. at 395

(omission and alteration in original) (quoting *United States v. Vest*, 842 F.2d 1319, 1329 (1st Cir. 1988)).

Additionally, "to be admissible for rehabilitation, a prior consistent statement must satisfy the strictures of [Mil. R. Evid.] 403 . . . . Where a military judge properly conducts the balancing test under [Mil. R. Evid.] 403, we will not overturn [his] decision unless there is a clear abuse of discretion." *United States v. Ruiz*, __ M.J. __, No. 24-0158, 2025 CAAF LEXIS 656, at *9 (C.A.A.F. 8 Aug. 2025) (internal quotation marks and citations omitted).

### 3. Analysis

Appellant contends the military judge abused his discretion by admitting portions of the testimony of AH and HC described *supra* as prior consistent statements by LA. We disagree.

#### a. AH

The military judge reasonably found the statement—"[LA] told [AH] someone did touch her. And [LA] said that it was – as I recall, her mom's boyfriend"—occurred in August 2020. The military judge questioned AH about when LA told her that she was sexually abused by her mother's boyfriend and AH used events in her life, changes in her friendship with LA, COVID, and school years to place the conversation in time. AH recalled the conversation was before August 2020 which was prior to the Defense's earliest theory for a motive to fabricate. That finding of fact was not clearly erroneous, nor was the military judge's admission of the prior consistent statement. We recognize LA stated she told AH about this about a week before she told her mother JA, which would have changed the analysis regarding admitting this as a prior consistent statement. Counsel for Appellant finds the later time frame more compelling coming from LA herself, and if LA's time frame was correct the statement would have occurred after the motive to fabricate when Appellant stopped talking to her mother in October, November, December 2020. The military judge did not abuse his discretion by weighing the two conflicting time frames and making a finding of fact that the statement occurred in August 2020 or before. The military judge's finding of fact that the statement occurred in August 2020 or before not only moved the statement well in advance of Defense's motive to fabricate but also moved it closer in time to the final time Appellant touched LA on 28 June 2020, both of which bolster the admission of this as a prior consistent statement. The military judge did not abuse his discretion by admitting this prior consistent statement and properly outlined his reasoning on the record.

#### b. HC

The military judge did not abuse his discretion admitting a prior consistent statement by HC. The military judge found that LA told HC she was sexually

abused by Appellant before LA spoke with her mother on 1 March 2021. He based this upon the fact that HC stated LA told him she was concerned about telling her mother and being believed. This timeline runs contrary to LA's testimony that she told HC after she told her mother. It was not clearly erroneous to make a finding of fact that this statement occurred at this time. We note this was still after the earliest motive to fabricate arose in October, November, and December 2020 when Appellant cut off communication with JA. However, the Government posited the Defense, through cross-examination, put forward a theory that JA and LA conspired to fabricate the allegation. The military judge found the prior consistent statement was admissible because it preceded LA speaking with her mother about this, the second potential motive to fabricate. Here the basis for admission as a prior consistent statement is less compelling. Even so, the military judge's ruling was not "arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *See Erikson*, 76 M.J. at 234 (citation omitted). Accordingly, we find the military judge did not abuse his discretion.

Even assuming the admission of the prior consistent statement to HC was admitted in error there was no prejudice. This statement merely established the fact that LA told a friend, HC, she was abused by Appellant prior to her talking to her mother. We note that AH testified that LA told AH in August 2020 that JA's mother's boyfriend, Appellant, sexually abused her. This earlier prior consistent statement, virtually identical in content, blunted any potential effect from the testimony of HC. In fact, evidence came out that LA told a third friend that she was sexually abused by Appellant, the day before the conversation LA had with her mother JA. The Defense did not object to this testimony. Therefore, testimony of HC, the third friend LA told that Appellant abused her before telling her mother, added little factually. Additionally, during his Mil. R. Evid. 403 analysis the military judge stated he would put the evidence in proper context; we are convinced he did.

**B. Factual Sufficiency**

**1. Additional Background**

### *a. Testimony About 2019 Offense (Before Deployment)*

At trial, LA testified Appellant touched her inappropriately prior to his 2019 deployment at her home in Tucson, Arizona, on one occasion she could remember. Prior to Appellant's deployment he had things at her house. Trial counsel conducted the following direct examination of LA:

> Q. In that time period, was there a period where [Appellant] had things at your house?
>
> A. Yes.
>
> Q. And what do you recall about that?

A. His bags were packed, like super big bags of stuff that he was going to take to [deployed location] and leave at my house as well.

. . . .

Q. Were there periods of time that he was staying over at your house?

A. Yes.

Q. Can you describe that? Like how frequently he was there? What would bring him there?

A. Not – he was never – he was never all the time there. He was like maybe a few times a month.

Q. Okay. And during this time period, would he continue to roughhouse with you?

A. Yes.

Q. Was that just like what we were describing before, the tickling, tossing onto couches and stuff like that?

A. Yes.

Q. Okay. On occasions that you would see [Appellant] during this time period, was he ever inappropriate with you sexually?

A. Yes.

Q. And how so?

A. It would be like subtle little like gestures, like touching my butt or touching my leg. And then the one time I really do remember is the one time that he had me on his shoulders and we went into me and my sister's room.

LA further testified Appellant picked her up, placed her on his shoulders and carried LA into her room, which was not abnormal. Then Appellant tossed LA onto her sister SA's bed, put his hands down her pants and touched her vagina, moving his hand in a circular motion. LA stated that she told him to stop quietly and spoke quietly because she did not want the family to hear. LA testified this was in the 6th grade, going on to the 7th grade when she was between 11 and 12 years old. LA explained she thought Appellant's "stuff" in her house was for when he went to a deployed location which she thought was for a year.

### b. Cross-Examination Regarding 2019 Offense

Trial defense counsel cross-examined LA regarding how LA described the events that occurred in 2019 in law enforcement interviews and how those accounts differed from one another and from her in-court testimony.

Trial defense counsel's cross-examination also tried to establish three points regarding the 2019 offense which when taken together could raise questions about whether LA shared a bedroom with her sister SA at the time. First, they established that LA asserted this occurred on her sister's bed in their shared bedroom. Second, they tried to confirm that when Master Sergeant (MSgt) LM, a housemate of JA, moved out, LA's sister moved her bed out of the shared bedroom and back into this room that originally belonged to SA. This would have been the weekend after 6 May 2019 according to JA's testimony (mid-May).[4] Third, the Defense tried to establish through cross-examination that the offense would have occurred in June vice May 2019.

Appellant left the Tucson area for his deployment on 9 June 2019. He had been over to JA's residence before MSgt LM moved out. He spent a lot of time at the residence the month before he left for his deployment.

### c. Testimony About 2020 Offense (After Deployment)

LA testified how the abuse occurred in June 2020 when LA and her family visited Appellant at Vandenberg AFB in the temporary lodging facility. After they returned from the shopping outlets on 27 June 2020 LA was in her room doing her hair. Then everyone came in the room. Eventually they all left and it was just LA and Appellant in the room and somehow the door was closed. LA could not remember how she wound up in the awkward physical position she described. LA described Appellant sitting at the foot of the bed and she was upside down with her legs on the bed on either side of Appellant's legs, her hips in the air and her hands on the floor of the room with her facing the floor. Trial counsel asked LA the following questions:

> Q. Okay so he's sitting on the foot of the bed and where are you with respect to that?
>
> A. On top of him, but like if he were to look down, it would be my butt and then my back and then my hands were on the floor. So my – so like all here [indicating upper torso] were closer to his feet and the floor.
>
> . . . .

---

[4] 6 May 2019 fell on a Monday and the weekend after would have been Saturday, 11 May, and Sunday, 12 May 2019.

Q. Where are your legs?

A. Like behind him kind of on like the side.

(Bracketed language in original).

LA testified about the temporary lodging facility room describing it in detail. Trial counsel showed LA a photograph of the room, which was marked as Prosecution Exhibit 12 for identification, which LA had not seen prior to trial and her description matched. Using Prosecution Exhibit 12, trial counsel walked her through what happened next.

Q. Okay. When you were in that position what happened?

A. He took his hand and put it on the inside of my shorts. It was on the outside of my underwear.

LA described how Appellant put his hands inside the right "sleeve" of her shorts and touched her vagina rubbing it up and down. LA pulled herself away using the floor and her hands. LA did not recall what happened after that. On this latest occasion, LA, now 13 years old, better understood what was happening and thought it was wrong. After this occurred she was ready to go home.

Q. When he was touching you at this time, do you recall what was going through your mind?

A. That it's not going to stop.

Q. That it's not going to stop. What did you mean by that?

A. It's going to be a - like a recurring event.

### d. Cross-Examination Regarding 2020 Offense

Trial defense counsel cross-examined LA about the 2020 allegation by focusing on how she described the bedroom door closing previously and whether she responded verbally to what Appellant did. Trial defense counsel pointed out that LA told law enforcement that her sister and KG closed the door on one occasion, but on another occasion JA stated it shut on its own and at trial stated she did not know how it closed. They also cross-examined LA on prior occasions where she told others she had told Appellant no and stop, where at trial she did not state this. To this, JA replied she could not recall if she said no or stop and if she did say it, it was not said loudly.

### 2. Law

We review issues of factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). "Our assessment of . . . factual sufficiency is limited to the evidence produced at trial." *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citation omitted). "While the court has the independent authority and responsibility to weigh the

credibility of the witnesses in determining factual sufficiency, we recognize that the trial court saw and heard the testimony." *United States v Vargas*, No. ACM 38991 (reh), 2022 CCA LEXIS 29, at 61–62 (A.F. Ct. Crim. App 14 Jan. 2022) (unpub. op.) (citing *United States v. Moss*, 63 M.J. 233, 239 (C.A.A.F. 2006)). "The test for factual sufficiency is 'whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *Rodela*, 82 M.J. at 525 (second alteration in original) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)).

"In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018)).

To convict Appellant of sexual abuse of a child, the Government was required to prove the following elements beyond a reasonable doubt: (1) Appellant committed a lewd act upon LA by touching her vulva with his hand, (2) that at the time LA had not attained the age of 16 years, and (3) Appellant did so with an intent to satisfy his sexual desire. *See* 10 U.S.C. § 920b(c); *Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 60.b.(2)(d).

### 3. Analysis

Appellant challenges the factual sufficiency of both specifications arguing the inconsistencies raised on cross-examination between LA's testimony and her pretrial statements arose because LA, an untruthful person, fabricated the allegations after Appellant betrayed her and her family. Our review of the record leaves us firmly convinced of his guilt of both specifications.

### a. The 2019 Offense

The Government established that LA had not attained the age of 16 years during the time of the 2019 offense. LA, 11 years old in May 2019, turned 12 years old at the end of May 2019. Though LA could not remember specific dates, her testimony clearly tied the offense to the month before Appellant deployed remembering he had huge bags at her house that he was going to deploy with. Though trial defense counsel tried to commit LA to this occurring in June 2019, LA could not remember specific dates and stated Appellant was never there all the time during this period. Of the events she reported during the pretrial investigation, LA testified to one event in this time frame that she remembered clearly where Appellant was roughhousing with LA, tossed her on to her sister's bed, reached into her pants, and touched her vagina. The

judge found her testimony regarding this offense credible, as do we. As LA only testified to one specific time that she could recall, the military judge convicted Appellant of one occasion which he described in his special finding as:

> [T]he event where [LA] testified the accused carried her into her room, which was in her mother's Tucson Arizona residence, tossed her on [her sister]'s bed put his hand down her pants and touched her vagina over her underwear. This event happened during the charged time frame just shortly before [Appellant] deployed in June of 2019.

We carefully considered and do not agree with Appellant's assertion that this could not have occurred the way the judge specified, namely in June 2019 and on SA's bed. Appellant left the area on 9 June 2019 and had been coming over more frequently the month prior to his departure, which means through May 2019. He came over before MSgt LM moved out which occurred in the middle of May, "the weekend after May 6th." The month of May is fairly encompassed in "shortly before [Appellant] deployed in June," especially when Appellant departed Tucson for this deployment on 9 June 2019. The military judge's special finding did not limit the time frame to the nine days in June, and LA's testimony matches the judge's finding this occurred in the lead up to Appellant's deployment and within the charged time frame.

Appellant does not argue that touching her vulva does not qualify as a lewd act. Instead, he alleges the Government did not prove this occurred. The military judge sitting at trial found that it did and we agree.

Applying neither a presumption of innocence nor a presumption of guilt in making our own independent determination, we find that the evidence, as we weighed it, convinces us of Appellant's guilt of the charged sexual abuse of a child offense in Specification 2 of the Charge against LA as modified by the military judge's finding of guilty by exceptions and substitutions beyond a reasonable doubt.

### b. The 2020 Offense

The Government established that LA had not attained the age of 16 years during the time of the 2020 offense. LA was 13 years old in June 2019 when this offense occurred.

LA described while she was upside down, her legs on either side of Appellant, her hands on the floor as he sat on the edge of the bed, Appellant slipped his hand in the right "sleeve" of her shorts and touched her vagina. LA's testimony regarding this awkward position and using her hands on the floor to move forward and ultimately get her legs down and off Appellant who was touching her and off the bed onto the floor both unique and detailed does not lend itself to being a product of fabrication. When the Defense tried to point to

differences in how she described this on prior occasions they only found differences in the syntax of the description and not substance of what occurred. Her testimony about this position and what occurred was not effectively challenged and did not change. The military judge found her testimony credible and "[w]hile the court has the independent authority and responsibility to weigh the credibility of the witnesses in determining factual sufficiency, we recognize that the trial court saw and heard the testimony." *Vargas,* unpub. op. at *61– 62. Our independent assessment is in line with the military judge's. We found her testimony credible.

We carefully considered the inconsistencies Appellant's trial defense counsel raised regarding the 2020 incident and find they lie at the periphery of the offense. The way in which a door closed, a detail which a child victim may not notice and could at various times attribute to different causes, does not call into question her credible testimony that the door was closed and what happened behind it. LA testified the door was closed and at trial she explained that she did not know how the door closed. Similarly, the fact that LA testified at trial that she could not recall if she said "no" or "stop" is not truly inconsistent with the defense assertion that she may have told others prior to trial that she did say no and stop. LA explained that she did not specifically recall if she said no or stop on that occasion but if she did it would have been softly as she had on prior occasions. It is reasonable to believe during the day Appellant had the opportunity to be behind closed doors with LA without anyone noticing or remembering as they went about playing, watching TV, and engaging in various activities. Four yards away is far enough if indeed everyone was in the living room that it is easy to understand how a softly spoken "no" or "stop" behind closed doors would go unnoticed under the din of children at play as TV programs played in the background. These inconsistencies, such as they are, do not give us pause regarding the core testimony which convinces us beyond a reasonable doubt of Appellant's guilt for this specification.

Applying neither a presumption of innocence nor a presumption of guilt in making our own independent determination, we find that the evidence, as we weighed it, convinces us of Appellant's guilt of the charged sexual abuse of a child offense in Specification 4 of the Charge against LA beyond a reasonable doubt.

## C. Ineffective Assistance of Counsel

### 1. Additional Background

#### *a. Failure to Advise and Prepare Appellant on his Right to Testify*

Appellant did not testify at his court-martial and told the military judge the decision not to testify was his personal decision. Appellant in his

declaration asserted, "My counsel informed me that I should not testify and that it would hurt my defense. The Defense team went over preparation for testifying one time with me for 10 minutes."[5]

This court granted a government motion to compel declarations from Appellant's trial defense counsel, Major (Maj) LH, Maj AA, and Maj SG, addressing Appellant's claims that they were ineffective by failing to adequately prepare him and advise him to testify in his own defense, or not, and on their failure to call material witnesses. All three counsel provided responsive declarations which are now attached to the record.[6]

Regarding the preparation and advice given to Appellant on his right to testify, all three of Appellant's defense counsel agree he was properly prepared and advised on the matter.[7] Maj LH explained:

> Over the years I represented MSgt Griffin the topic of his potential testimony was discussed several times. The week before the trial at issue here, we performed a mock direct examination and cross-examination. This lasted no less than 90 minutes. Through this, we determined he did not present well. The night before trial, MSgt Griffin and I did meet for a short session to talk about his decision to testify once more. At that time, MSgt Griffin planned to not testify consistent with our advice. He knew this was a fundamental right of his, and he could change his mind if he wanted. Ultimately, MSgt Griffin was prepared to testify, but defense counsel and MSgt Griffin agreed it would likely not be beneficial to his case.

Maj AA, Appellant's senior defense counsel, agreed with the facts set forth above and added that in addition to not presenting well, "the answers produced

---

[5] This court granted a motion from Appellant's defense counsel to attach a declaration from Appellant which we find we may consider to "resolv[e] issues raised by materials in the record." *United States v. Jessie*, 79 M.J. 437, 444 (C.A.A.F. 2020).

[6] This court granted a government motion to attach declarations from Appellant's three trial defense attorneys—Maj LH, Maj AA and Maj SG—responsive to Appellant's claims of ineffective assistance of counsel. We find we may consider this material in order to "resolv[e] issues raised by materials in the record." *Id.*

[7] With respect to the factual dispute between Appellant stating his preparation lasted 10 minutes and three defense attorneys' affidavits that they all prepared him over 90 minutes, we conclude additional factfinding is not necessary in this case for two reasons. First the parties' attachments compellingly demonstrate the improbability of Appellant's claim on this issue, and second even if the facts alleged were resolved in Appellant's favor it would not result in relief. Therefore, we find we may resolve the issue based on the record before us. *United States v. Guinn*, 47 M.J. 236, 248 (C.A.A.F. 1997).

by MSgt Griffin were problematic, inconsistent with the evidence." Instead, Maj AA elicited information from Appellant to use during cross-examination of other witnesses. Maj SG agreed with his colleagues, stating "counsel all agreed to advise [Appellant] not to testify based upon the facts of the case, years of preparation, and the answers to questions [Appellant] provided." Maj SG added Appellant "came off as unsympathetic and shifty, and we recommended he not testify. Additionally, a number of his statements during our questioning of him related to the facts of the case were inconsistent with the majority of evidence that would be presented during the case."

### b. Failure to Contact MC and BB as Potential Witnesses

Appellant's affidavit states his trial defense counsel failed to contact MC and BB, individuals he dated during the charged time frame as potential witnesses.

Trial defense counsel all agreed calling MC and BB, romantic partners of Appellant, as witnesses would have weakened their case.[8] These witnesses had no knowledge of the facts or the people involved and could at best have served as character witnesses. Maj SG explained the trial defense counsel knew of Appellant's 2023 Letter of Reprimand for an inappropriate relationship with a junior Airman which contained facts at issue as "arguably similar to the facts at issue in this case." After doing a cost-benefit analysis of the testimony these witnesses could provide they found the cost of calling them as witnesses outweighed any benefit and therefore did not find a need to contact them. The trial defense counsel agreed, the benefit, the limited probative value of the character evidence these witnesses could provide, was outweighed by the prejudicial harm that the character evidence would open the door to. Maj AA explained they focused on character evidence of Appellant being a good father which they presented to the military judge through multiple witnesses.

### c. Failure to Call LA's Sister SA as a Witness.

The trial defense counsel chose not to call SA, the sister of LA, as a witness because they could not interview her and felt calling her as a witness created too much risk. SA's mother JA denied the Defense permission to interview SA before trial.[8] The trial defense counsel calculated SA's allegiance would be to JA and her testimony created too much risk, and therefore they agreed the risk to Appellant's case of calling her as a witness was too high.

---

[8] We conclude additional factfinding is not necessary on this issue as the parties' attachments are not materially in conflict, and we find we may resolve the issue based on the record before us. *Id*.

### 2. Law

The Sixth Amendment[9] guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). In assessing the effectiveness of counsel, we apply the standard set out in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence as stated in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *See Gilley*, 56 M.J. at 124 (citation omitted). We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009)).

We utilize the following three-part test to determine whether the presumption of competence has been overcome: (1) are the appellant's allegations true, and if so, "is there a reasonable explanation for counsel's actions;" (2) if the allegations are true, did trial defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers;" and (3) if trial defense counsel were deficient, is there "a reasonable probability that, absent the errors," there would have been a different result? *Id.* (alteration and omission in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)).

The burden is on the appellant to demonstrate both deficient performance and prejudice. *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citation omitted). "[C]ourts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Id.* (quoting *Strickland*, 466 U.S. at 689) (additional citation omitted). "Scrutiny of counsel's performance should be highly deferential." *United States v. Metz*, 84 M.J. 421, 428 (C.A.A.F. 2024) (citing *Strickland*, 466 U.S. at 689). We will not second-guess reasonable strategic or tactical decisions by trial defense counsel. *Mazza*, 67 M.J. at 475. With respect to prejudice, a "reasonable probability" of a different result is "a probability sufficient to undermine confidence in the outcome" of the trial. *Datavs*, 71 M.J. at 424 (quoting *Strickland*, 466 U.S. at 694) (additional citation omitted).

### 3. Analysis

Appellant's assignments of error brief asserts trial defense counsel were ineffective by (1) failing to properly prepare and advise him on testifying, (2) failing to contact MC and BB as potential witnesses, and (3) failing to call LA's sister SA as a witness. Applying the three-part test from *Gooch* to each of the three allegations in turn below, we find no error materially prejudicial to Appellant.

---

[9] U.S. CONST. amend. VI.

### *a. Failure to prepare and advise Appellant on testifying*

Appellant's claim that his trial defense counsel failed to prepare and advise him on his right to testify is resolved with the first prong of the analysis. When we ask are the appellant's allegations true, the answer is the allegation is not accurate. Appellant's assertion that they did not prepare him to testify is contradicted by each of his three trial defense counsel. Each of their affidavits describe how they advised Appellant multiple times over years of representation, how they worked with Appellant on a mock direct and cross-examination for a minimum of 90 minutes, and how they collectively assessed his testimony presented poorly and would not help his case. Defense counsel prepared Appellant and properly advised him based on their assessment of his testimony and how it belied the evidence in the case all the while ensuring Appellant knew that whether or not he testified was his choice. Given trial defense counsel's collective assessment that Appellant's mock testimony "did not present well" and was "problematic and inconsistent with the evidence," advising him not to testify was the sound and appropriate choice. Accordingly, we find Appellant has failed to demonstrate he is entitled to relief for ineffective assistance of counsel for this claim.

### *b. Failure to contact MC and BB as potential witnesses*

Applying the three-part test from *Gooch*, we find Appellant's allegation that trial defense counsel did not contact MC and BB two individuals he dated as potential witnesses is true. However, with due deference to the applicable presumption of competence, we find a reasonable explanation for this choice, and trial defense counsel did not fall measurably below the standard of performance expected of fallible lawyers. Appellant's declaration is silent on what he wanted MC and BB to testify to. Trial defense counsel stated these witnesses did not know the witnesses in the case and could, at best, serve as character witnesses. They agreed that the limited value of such character evidence these two witnesses could have presented was overshadowed by the prejudicial evidence that testimony would have opened the door to. Instead, they made the choice to forego evidence of character for respect to women and peacefulness and pivoted to character evidence of Appellant being a good father. This strategy prevented potentially damaging cross-examination about an inappropriate relationship with a junior Airman which contained eerily similar facts that would not have served him well. Specifically, the Letter of Reprimand referenced that Appellant continuously called one of the junior female Airman he had an inappropriate relationship with "stinky," a term he commonly used with LA. This admittedly odd term of endearment was one Appellant used frequently with LA, and that connection could not help his case. We find Appellant has not overcome the strong presumption that trial defense counsel's performance was "within the wide range of reasonable professional assistance."

*Datavs*, 71 M.J. at 424 (citation omitted). Applying the "highly deferential" standard applicable when reviewing claims of ineffective assistance, *see Metz*, 84 M.J. at 428, we find there is a reasonable explanation as to why trial defense counsel did not contact these witnesses. Trial defense counsel avoided potential negative cross-examination and still provided Appellant the benefit of character evidence by establishing character for being a good father through several witnesses. The carefully considered decision not to contact these two witnesses did not fall below the standard expected of fallible lawyers. Moreover, there is no "reasonable probability" that calling MC and BB, two romantic partners as potential character witnesses in this case, would create "a probability sufficient to undermine confidence in the outcome" of the trial. *Datavs*, 71 M.J. at 424. This is especially true where, as here, Appellant's trial defense counsel were able to elicit different character evidence on behalf of Appellant without opening the door to cross-examination regarding his misconduct. Accordingly, we find Appellant has failed to demonstrate he is entitled to relief for ineffective assistance of counsel for this claim.

### c. Failure to Call LA's Sister SA as a Witness

Applying the three-part test from *Gooch*, we find Appellant's allegation that trial defense counsel did not call LA's sister SA as a witness is true. However, with due deference to the applicable presumption of competence, we find a reasonable explanation for this choice, and trial defense counsel did not fall measurably below the standard of performance expected of fallible lawyers. The defense team were denied the ability to interview SA, a minor, and therefore they felt calling her as a witness created too great a risk to Appellant. After being denied permission to interview SA, trial defense counsel chose not to call SA as a witness. Moreover, and relatedly, Appellant failed to establish that if SA testified there would have been a reasonable probability of a different result. Accordingly, we find Appellant has failed to demonstrate he is entitled to relief for ineffective assistance of counsel for this claim.

## D. Post-Trial Delay

### 1. Law

We review de novo whether an appellant is entitled to relief for post-trial delay. *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006).

In *Moreno*, the CAAF established a presumption of facially unreasonable delay where: (1) the convening authority did not take action within 120 days of the completion of trial, (2) the record was not docketed with the Court of Criminal Appeals (CCA) within 30 days of the convening authority's action, or (3) the CCA did not render a decision within 18 months of docketing. 63 M.J. at 142.

Where there is a facially unreasonable delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice [to the appellant]." *Moreno*, 63 M.J. at 135 (citations omitted). In *Barker*, the Supreme Court also identified three types of cognizable prejudice for purposes of an appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) "particularized" anxiety and concern "that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision;" and (3) impairment of the appellant's grounds for appeal or ability to present a defense at a rehearing. *Id*. at 138–40 (citations and footnotes omitted). "Of those, the most serious is the last [type], because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker*, 407 U.S. at 532.

Additionally, where an appellant has not shown prejudice from the delay, we cannot find a due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

Independent of any due process violation, this court may provide appropriate relief where there is "excessive delay in the processing of the court-martial after the judgment was entered into the record." *United States v. Valentin-Andino*, 85 M.J. 361, 364 (C.A.A.F. 2025) (citing Article 66(d)(2), UCMJ, 10 U.S.C. § 866(d)(2)). If a CCA decides relief is warranted for excessive post-trial delay under Article 66(d)(2), UCMJ, "that relief must be 'appropriate,' meaning it must be suitable considering the facts and circumstances surrounding that case." *Id*. at 367. "This does not require a [CCA] to provide relief that is objectively meaningful, and it does not obligate a [CCA] to explain its reasoning regarding the relief it does provide." *Id*.

### 2. Analysis

We issue our opinion more than 18 months after this court docketed Appellant's record of trial in this case on 12 July 2024. Therefore, under *Moreno*, there is a facially unreasonable delay. Accordingly, we have considered the *Barker* factors and find no violation of Appellant's due process rights.

While the length of the delay was exceeded by a matter of a couple of weeks of the *Moreno* standard for facially unreasonable delay, we find it is not an egregious delay. The delay included ten requests by Appellant for enlargements of time that amounted to 390 days of a 540-day standard. We granted the Government's request to compel affidavits from Appellant's trial defense counsel responsive to the claims made by Appellant, and therefore afforded the Government an additional 14 days to file its answer to Appellant's assignments of error. As a result, about 466 days passed before the court was in possession

of both Appellant's brief and the Government's answer. Thus, the reasons for the delay were largely those requested by Appellant and overall reasonable, and Appellant did not assert his right to a timely review. Finally, we do not find Appellant suffered cognizable prejudice. We do not find Appellant suffered oppressive incarceration or prejudice to his grounds for appeal or ability to defend himself at a rehearing. *See Moreno*, 63 M.J. at 138–40.

Absent prejudice, we find the delay has not been so egregious as to adversely affect public perception of the military justice system. This court's opinion is being issued approximately two weeks beyond the *Moreno* standard for facially unreasonable delay. Appellant's ten motions for enlargement of time significantly contributed to the delay. Considering the *Barker* factors and the circumstances as a whole, absent prejudice, in light of the CAAF's guidance in *Toohey*, 63 M.J. at 362, we do not find a violation of Appellant's constitutional due process rights.

We do not find this case warrants relief for post-trial delay.

### III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to Appellant's substantial rights occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court